* * * * * * * * * * *
The Full Commission reviewed the prior Decision and Order, based upon the record of the proceedings before Deputy Commissioner Stephenson and the briefs and oral arguments before the Full Commission. The appealing party has not shown good ground to reconsider the evidence; receive further evidence; rehear the parties or their representatives; or amend the Decision and Order. Accordingly, the Full Commission affirms the Decision and Order of Deputy Commissioner Stephenson.
 * * * * * * * * * * *
Following the hearing before the Deputy Commissioner, the Deputy Commissioner entered the following preliminary orders, which are hereby adopted in whole by the Full Commission:
 PRELIMINARY ORDERS
1. Prior to the hearing before the Deputy Commissioner, the issue of the plaintiff's competency was raised. This matter had been previously continued, in part, because counsel for the plaintiff needed additional time to seek a guardian ad litem
for the plaintiff, who was not competent to testify and represent his own interests. At the time of this rescheduled hearing, counsel for the plaintiff did not present a guardian ad litem.
Therefore, counsel for the plaintiff, counsel for the defendant, and Deputy Commissioner Stephenson conducted a voir dire of the plaintiff to determine whether he was competent to testify at trial. After questioning, the Deputy Commissioner determined that the plaintiff was in fact competent to testify and represent his own interests. Therefore, it is ORDERED that the plaintiff is not required to be represented by a guardian ad litem.
2. Counsel for the defendant requested that all references to patients of Cherry Hospital, with the exception of the plaintiff, be held in confidence by the Industrial Commission. Therefore, pursuant to the defendant's request, the undersigned hereby issues a PROTECTIVE ORDER to limit the use of names and patient records, excepting the plaintiff and his record, strictly to the parameters of the plaintiff's tort claim action against Cherry Hospital.
 * * * * * * * * * * *
The Full Commission finds as fact and concludes as matters of law the following, which were entered by the parties as:
 STIPULATIONS
1. All parties are properly brought before the Industrial Commission and the Commission has jurisdiction over the parties and of the subject matter, related to the alleged attack upon the plaintiff, on or about May 17, 2000, at Cherry Hospital in Goldsboro, North Carolina.
2. All parties have been correctly designated and there is no question as to misjoinder or nonjoinder of parties.
3. The claim for damages arises under the North Carolina Tort Claims Act.
4. All relevant medical records pertaining to the plaintiff's injuries and treatment are admitted, pursuant to an Affidavit submitted by the custodian of such records.
5. All the plaintiff's records from Cherry Hospital have been stipulated into evidence.
6. The employees named by the plaintiff in his Affidavit, Mangaraju Kolluru, MD, Hoda Eskander, MD, Robert Ownes, MD, R. Maye, RN, Rose Malpass, RN, Dennis Harris, PA-C, and V. Srikantha, PA, were employed by the defendant at the time of the alleged attack, and if on duty on the day in question, were acting in the scope and course of their employment with the defendant.
7. By Order of Deputy Commissioner George T. Glenn II, and by stipulation of the parties, the plaintiff does not contend that this is a medical malpractice action.
 * * * * * * * * * * *
Based upon all of the competent evidence of record and reasonable inferences flowing therefrom, the Full Commission makes the following:
 FINDINGS OF FACT
1. The plaintiff alleged that Mangaraju Kolluru, MD, Hoda Eskander, MD, Robert Ownes, MD, R. Maye, RN, Rose Malpass, RN, Dennis Harris, PA-C, and V. Srikantha, PA, were negligent when they failed to supervise the nursing and other staff properly; failed to provide a safe environment for psychiatric care; failed to keep other patients from harming the plaintiff; and failed to properly supervise patients in their care. The plaintiff further asserted that this alleged negligence resulted in injuries to him, while he was a patient at Cherry Hospital.
2. The defendant denied any negligence, contributory negligence, intervening and superseding criminal acts, set off, or contribution.
3. On the morning of May 16, 2000, after inflicting multiple lacerations on himself with a box cutter, the plaintiff was involuntarily committed to Cherry Hospital. It was noted in treatment records that the plaintiff cut himself 20 times about the head, chest, and legs, in order to secure narcotics. The plaintiff admitted having a drug problem, and having been previously admitted to Cherry Hospital for drug abuse.
4. After his commitment, on May 16, 2000, the plaintiff made repeated telephone calls to his family, complaining that the staff at Cherry Hospital would not provide him with narcotics he needed for his pain. The plaintiff stated that in order to obtain narcotics, he would intentionally run his head through glass to self inflict an injury that would require the administration of narcotics. Cherry Hospital staff members informed the plaintiff that under no circumstances would he be provided with narcotics, and that any self-injury would not be rewarded with narcotics.
5. On May 16, 2000, the plaintiff complained to and attempted to persuade Ruth Maye, RN, that his right leg was broken, and that he therefore required narcotics to address his pain. Despite this plea, there was no evidence that the plaintiff suffered from a broken right leg, and his complaints were viewed by staff as another attempt to be administered narcotics.
6. At approximately 12:00 p.m. on May 17, 2000, the plaintiff continued to seek narcotics from the staff at Cherry Hospital. The staff repeatedly denied the plaintiff's demands. Upon one particular denial, the plaintiff became very irate, attempted to throw a wheel chair, and threatened to sue Cherry Hospital for "poor health care."
7. Prior to the alleged attack upon him, the plaintiff was noted to have been at the nurse's station, where he asserted a new claim that his left knee was broken, and that he therefore required narcotics to address his pain. The plaintiff was again denied narcotics by the staff.
8. At approximately 3:15 p.m. on May 17, 2000, Erthel Anderson, a Cherry Hospital staff member, observed the plaintiff and another patient in a verbal confrontation regarding cigarette smoking. Pursuant to Cherry Hospital procedure, Anderson separated the arguing patients, spoke to them individually, observed that the patients had settled and resolved the issue, and allowed the patients to proceed with their respective activities. At no time did the patients physically confront one another, nor were physical threats made between the patients. The Full Commission finds that Anderson's actions comported with all Cherry Hospital procedures.
9. Following the incident observed by Anderson, the plaintiff proceeded into the "day room" (otherwise known as the "TV room"), where he began watching television.
10. At approximately 4:00 p.m. on May 17, 2000, Nate Phillips conducted a routine check of the ward, which included the day room where the plaintiff sat. It was noted by Phillips that at 4:00 p.m., the plaintiff was awake, watching television. Phillips's actions of checking the day room were part of the normal, standard operating procedures of Cherry Hospital.
11. At approximately 4:18 p.m., the plaintiff was involved in an alleged altercation with other patients in the day room. The plaintiff first alleged that while he was struck in the head while asleep in the day room, which caused him to fall out of his wheel chair; the "whole ward" then "jumped" and began to beat him; and, the assailants stomped on his left leg, causing a fracture to his left tibia. However, during his testimony at hearing before the Deputy Commissioner, the plaintiff instead claimed that he was struck in the head; he stood up to fight his attackers; he threw one attacker into the television; he threw a second attacker into a book shelf; he continued to stand and fight when another attacker approached him from the side, and kicked him in the side of the left shin, causing him to suffer the broken left tibia.
12. The plaintiff testified that at the time of the attack, no staff members were in the ward, and that they all had gone on "break." According to the plaintiff, the absence of staff was the proximate cause of the assault and injuries.
11. Prior to the attack, it was noted that the plaintiff had provoked other inmates on the ward, even daring them to strike him.
12. During the alleged attack, various staff members noted noises coming from the day room, and immediately proceeded to the day room, where they found the plaintiff on the floor, with other patients standing in proximity.
13. At the time of the alleged attack, four staff members were on the ward. This number of staff members was double the minimum staffing requirements.
14. At the time of the alleged attack, staff member Erthel Anderson was situated approximately 10 to 15 feet from the scene, and was in the day room.
15. At the time of the alleged attack, staff member Ken Marsh was approximately 25 to 30 feet from the scene.
16. At the time of the alleged attack, staff member Rico Raynor was approximately 30 to 35 feet from the scene.
17. At the time of the alleged attack, staff member Nate Phillips was approximately 40 to 50 feet from the scene.
18. As a result of the alleged attack, the plaintiff presented for treatment with injuries, most notably a broken left tibia.
19. The plaintiff's testimony repeatedly failed to comport with the documentary evidence, as follows:
 A. The plaintiff claimed that his father forced him to enter Cherry Hospital for depression. However, the documentary evidence presented indicates that the plaintiff was involuntarily committed by a Judge, because of his self-injurious acts.
 B. The plaintiff testified that he did not threaten self-harm while in Cherry Hospital in order to secure narcotics; however, the plaintiff's treatment records reflect that he repeatedly made such threats to staff members;
 C. The plaintiff testified that he had no problems with other patients before the alleged attack; however, the records reveal that he had repeatedly provoked other patients.
 D. The plaintiff testified that he was threatened by another inmate. In his Affidavit, the plaintiff alleged that "[p]rior to the attack," he "expressed concern about his safety to one or more members of the staff." The plaintiff also alleged in his Affidavit that "[p]rior to the attack, Nurses and other staff members had knowledge of threats made to" him, but that they "took no measures to correct the situation." Despite these allegations and contentions, the plaintiff offered no supporting evidence. A review of the plaintiff's records reveals that he made no comments or warnings to staff members about the impending violence against him. This absence of such a notation is significant, as it was Cherry Hospital policy to note such threats in the files of both the threatened patient and the threatening patient.
 E. When questioned, the plaintiff was unable to name any of the staff members that he allegedly warned; was unable to describe the staff members he allegedly warned; was unable to specifically recall where or when he allegedly warned these staff members; and was unable to specifically recall how many staff members he spoke to about the threats allegedly made against him.
 F. The plaintiff testified that he was frightened by the alleged threats made against him; however, it appears that despite these threats, the plaintiff spent time in the day room where he felt comfortable enough to sleep, instead of seeking safety with staff members.
 G. The plaintiff testified that his left tibia was broken when he was kicked from the side; however, the medical testimony offered by other witnesses established that the plaintiff's description of the attack did not comport with the mechanism of his injury.
 H. The plaintiff could not name a single member of the Cherry Hospital staff that was negligent. When asked at trial, the plaintiff admitted that he had no evidence that the staff "were not where they were supposed to be."
20. Dennis Harris, employed by Cherry Hospital as a Physician-Extender II, testified that he arrived at the ward soon after the alleged attack upon the plaintiff. Harris indicated that although the plaintiff initially claimed that the whole ward jumped on him without provocation, the plaintiff later admitted his role in provoking the attackers. Harris also testified that the mechanism of the plaintiff's injury did not comport with the plaintiff's description of the attack; that according to a diagram of the ward that was stipulated into evidence, there were four staff members on the ward at the time of the alleged attack; that although patients on the ward frequently argue with one another, there was no requirement to separate patients involved in minor arguments, such as the argument involving the plaintiff as witnessed by Erthel Anderson.
21. Laura Rose, a nurse on the ward, testified that she arrived at the scene a short time after the alleged attack; that there was a sufficient staff presence on the ward; that although the plaintiff later claimed to have been struck in the face, there were no corresponding injuries; that the plaintiff first told her that he simply fell out of his chair and injured his left leg; that the mechanism of the plaintiff's injury did not comport with his description at trial of how the injury was inflicted; that she knew of no threats made against the plaintiff, but had there been such threats, they would have been noted in his file; and, that despite the plaintiff's allegations, there were no breaches of Cherry Hospital procedure or training.
22. Billy Tart, a nurse manager, testified that the staff acted appropriately and within Cherry Hospital procedures.
23. The evidence suggests that the plaintiff had a history of drug abuse; that he repeatedly sought narcotics while committed in Cherry Hospital; that he threatened self-harm to secure narcotics; that he was told by staff members that he would only be provided over-the-counter pain relievers; that prior to the alleged attack he claimed to have a broken leg; and, that he provoked others to attack him. This pattern of behavior comports with the plaintiff's previous act of cutting himself 20 times with a box cutter, in an effort to secure narcotics and satisfy his addiction.
24. The plaintiff contends that the staff members all "went on break" at the same time, leaving a lack of supervision on the ward, which proximately caused the alleged attack upon him. However, the evidence presented clearly demonstrated that there were four staff members on the ward, one of whom was as close as 10 from the plaintiff, when the alleged attack occurred. Therefore, the plaintiff's contention that the defendant breached its supervisory duties was not supported by any competent evidence.
25. The plaintiff offered no testimony or evidence regarding hospital training, staffing requirements, procedure, or policy. Therefore, the plaintiff was unable to refute the testimony offered by Mr. Harris, Ms. Rose and Mr. Tart, that the staff at Cherry Hospital acted according to Cherry Hospital policy and within industry standards.
26. The plaintiff offered no evidence proving that acts or omissions of Cherry Hospital staff proximately caused his injuries. The plaintiff specifically failed to provide evidence that the named employees committed any acts or omissions that would constitute negligence.
 * * * * * * * * * * *
Based upon the foregoing stipulations and findings of fact, the Full Commission reaches the following:
 CONCLUSIONS OF LAW
1. The plaintiff filed his action pursuant to the Tort Claims Act, which allows persons to sue state departments or agencies for injuries caused by the negligence of state employees. Under the provisions of the Tort Claims Act, negligence is determined by the same rules that are applicable to private parties. Bolkirv. N.C. State University, 321 N.C. 706, 709, 365 S.E.2d 898, 900
(1988). The terms of the Tort Claims Act must be strictly construed. Northwestern Distributors, Inc. v. DOT,41 N.C. App. 548, 255 S.E.2d 203, cert. denied, 298 N.C. 567, 261 S.E.2d 123
(1979). The plaintiff must show that the injuries sustained were the proximate result of a negligent act, by the named state employee, acting within the course and scope of his employment. N.C. Gen. Stat. § 143-291.
2. It is well settled that in order to recover on a civil claim for negligence, the plaintiff must prove (1) existence of a duty to him; (2) a breach of that duty by the defendant (the named employees thereof in the tort claim); and (3) injury sustained; (4) as a proximate result of the breach of duty. Pulley v. RexHospital, 326 N.C. 701, 392 S.E.2d 380 (1990).
3. In order to recover under the North Carolina Tort Claims Act, it is necessary that the Affidavit filed in support of the claim and the evidence offered before the Commission identify the employee alleged to have been negligent, and set forth the specific act or acts of negligence relied upon. Floyd v. HighwayCommission, 241 N.C. 461, 85 S.E. 2d 703; Ayscue v. N.C. StateHighway Comm., 270 N.C. 100, 153 S.E. 2d 823 (1967) and Frazierv. Murray, 135 N.C. App. 43, 519 S.E.2d 525 (1999). Without proof of negligence by the specific named employee, the plaintiff may not recover. Woolard v. DOT, 93 NC App. 214,377 S.E.2d 267, cert. denied, 325 N.C. 230, 381 S.E.2d 782 (1989).
4. Although the personnel at Cherry Hospital had a duty to care for the plaintiff during his involuntary commitment, the plaintiff has failed to prove a breach of that duty. Specifically, the plaintiff contends that he had repeatedly warned staff members about the threats made against him. Yet, there is no evidence in the record to support this contention. Therefore, the plaintiff has failed to prove that the defendant had notice of any alleged danger to him. Without said notice, the defendant cannot be held responsible for damages to the plaintiff. See, Willis v. City of New Bern, 137 N.C. App. 762,529 S.E.2d 691 (2000). Further, the happening of an injury does not raise the presumption of negligence. Smith v. Hickory,252 N.C. 316, 318, 113 S.E.2d 557, 559 (1960) (citation omitted). There must be evidence of notice either actual or constructive.Id.
5. In his Affidavit, the plaintiff named Mangaraju Kolluru, MD, Hoda Eskander, MD, Robert Ownes, MD, R. Maye, RN, Rose Malpass, RN, Dennis Harris, PA-C, and V. Srikantha, PA, as the alleged negligent employees. The plaintiff presented no evidence of negligence on the part of these individuals, and therefore his claim must fail. See, N.C. Gen. Stat. § 143-291, see also,Ayscue v. Highway Commission, 270 N.C. 100, 103, 153 S.E.2d 823
(1967).
6. The plaintiff failed to provide any expert testimony to support his allegations that the staff at Cherry Hospital failed to conform to an accepted standard of care or to industry standards. Without such evidence, the plaintiff cannot even show the level of care that was owed to him. Without evidence or expert opinion of that duty owed, the plaintiff cannot, therefore, prove a breach of the duty owed to him.
7. Even if it can be assumed that the defendant breached a duty to the plaintiff, his claim, nevertheless, is barred as he contributed and proximately caused his injuries when he provoked other patients; failed to notify staff of the alleged threats made against him; and put himself in a position to be attacked.
 * * * * * * * * * * *
Based upon the foregoing findings of fact and conclusions of law, the Full Commission enters the following:
 ORDER
1. The plaintiff's claim pursuant to the Tort Claims Act is hereby DENIED.
2. The parties shall bear their own costs.
This 8th day of November 2005.
 S/_______________ CHRISTOPHER SCOTT COMMISSIONER
CONCURRING:
 S/_____________ PAMELA T. YOUNG COMMISSIONER
DISSENTING:
 S/_____________ THOMAS J. BOLCH COMMISSIONER